IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **REGINA LYNN HARPER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.   ) | Case No. 15-CV-15-PJC |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## OPINION AND ORDER

Claimant, Regina Lynn Harper ("Harper"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Harper's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. [Dkt. 7]. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Harper appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred in determining that Harper was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Procedural History**

On March 28, 2011, Harper protectively filed her application for disability insurance benefits alleging an onset date of June 1, 2009. (R. 144-147). The application was denied initially and on reconsideration. (R. 98-102, 106-108, ). An administrative hearing was held before an ALJ on January 30, 2013. (R. 36-92). The ALJ entered a decision on April 23, 2013,

finding Harper was not disabled within the meaning of the Social Security Act, and therefore not entitled to benefits. (R. 19-31). The Appeals Council denied Harper's request for review on November 28, 2013. (R. 1-15). Thus, the January 30, 2013, decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981, *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

## Claimant's Background

Harper was 45 years old on her alleged disability onset date, June 1, 2009, and she was 49 years old when the ALJ entered his decision on April 23, 2013. (R. 30, 146-147). At the administrative hearing on January 30, 2013, Harper testified that she graduated from high school. (R. 50). Harper claimed she was unable to work due to blindness in the right eye, uncontrolled diabetes, depression and diabetic neuropathy in her feet, legs, hands, wrists and elbows. (R. 51-54, 60). She said that her legs "give out" a lot and that she falls "quite often." (R. 61). She testified that her hands and fingers go numb for a few minutes daily and that she has pain in her elbow. (R. 62-63). Harper testified that she stopped working in 2009 because of feeling excessively tired caused by diabetes and because she could no longer drive to work. (R. 54). She said that she had last driven in July 2009. (R. 51). When she stopped working, she was living in a house with her two children, her two grandchildren and her husband. (R. 43). At the time of the hearing, only her husband and her disabled autistic son were living with her. (R. 44). She claimed she did not look for a job because her "eyesight was an issue" and that she already suffered from depression and did not "think that [she] was worthy." (R. 54).

In describing her daily activities, Harper said that she makes chocolate milk for her autistic seventeen year old son and that, on the two days per week that he goes to school, she gets him up and changes his clothes. (R. 48). She testified she is able to do the laundry and cook, with

breaks to sit because of pain in her legs. (R. 49, 70). She said she spends the rest of the time laying on the couch and watching TV. (R. 69). Harper testified that she is so tired that three or four days a week she cannot get out of bed. (R. 74).

Harper's husband, Terry Harper, testified that Harper spends most of her time laying down, resting. (R. 78). He testified that Harper does some minimal care for their autistic son, making sure he has his medicine, and that she tries to do housework a little bit at a time. (R. 78-79). Mr. Harper testified that he mows the yard because Harper can only mow ten or fifiteen minutes at a time. (R. 80). Mr. Harper testified that his wife is depressed, irritable and anxious and that she will not get out of bed for two days. (R. 81-82). This happens, he said, a couple times a month. (R. 82). Mr. Harper testified that his grandsons come over quite often and that "we" have to take care of them. (R. 83-84). He testified that his wife drove his car home from the hospital when was hospitalized six months prior to the hearing. (R. 84). He testified that he and his wife grocery shop together and that she has to stop and rest while doing so. (R. 85).

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[1] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision is supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall v. Astrue*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence nor substitute its judgment for that of the Commissioner, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.* Even if

---

[1] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

the court would have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *See White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

**Medical Evidence**

Treatment Records:

Dianna M. Willis, D.O., has been Harper's primary medical care provider since at least March 12, 2009. (R. 352-355). On that date, Harper's active problems were: Diabetes Mellitus Type II - Uncomplicated, Uncontrolled; Hyperlipidemia; and, Ulcerative Colitis. (R. 352). In April 2009, Harper began complaining of blurry vision. (R. 356-363). Harper was referred for an MRI and was examined by a neurologist, John DeWitt, D.O., F.A.A.N. (R. 257-258, 276-278). Dr. DeWitt suspected ischemic optic neuropathy but, because of a "rather profound scotoma," he ordered further diagnostic studies. (R. 276). Blood work revealed Harper was positive for infection with Bartonella bacteria which is associated with "Cat Scratch Disease." (R. 256, 270). On April 28, 2009, a brain MRI revealed a right maxillary mucus retention cyst in the right eye. (R. 257). At Dr. Dewitt's request, Harper was examined by Anil D. Patel, M.D., a neuro-ophthalmologist, on June 8, 2009. (R. 284). Dr. Patel agreed with Dr. DeWitt's diagnosis of right optic neuropathy likely related to cat-scratch neuroretinitis. (R. 284). Dr. Patel explained to Harper that there is no further treatment for the condition and that it was likely that there was permanent damage to the right visual function. *Id.* He recommended no further investigation at that stage. *Id.*

Harper's treatment records from Dr. Willis show that Harper did not immediately comply with the steroid treatment recommended by Dr. DeWitt to try to restore her right eye vision because she was afraid her blood sugar levels would be affected. (R. 371). Dr. Willis urged Harper to take the medication prescribed by Dr. DeWitt and assured Harper that she would help

her adjust her diabetes medications accordingly. *Id.* On May 21, 2009, Dr. Willis' notes indicate Harper was taking the prednisone as prescribed by Dr. DeWitt. (R. 372).

Over the following year, Dr. Willis monitored Harper's treatment for Diabetes and Hyperlipidemia and overall health, which she routinely described as "feeling fine and not feeling poorly (malaise)." (R. 376-397). On February 13, 2010, Harper reported higher blood sugar, possibly due to having discontinued one of her medications. (R. 394). Harper also reported being stressed, with high irritability and hypersensibility, because she had been fighting with her daughter. (R. 396). The previous week, Harper had received treatment at St. John's Emergency Room and then was admitted for five days to Laureate Psychiatric Clinic and Hospital for depression and suicidal ideation after an altercation with her daughter. (R. 301-314, 317-347). Upon discharge on February 12, 2010, Harper's depressed mood was improved and her mood was better. (R. 342). She was diagnosed with Major depressive disorder, recurrent episode, severe, without mention of psychotic behavior. (R. 343).

On December 16, 2010, Harper advised Dr. Willis that she had been out of her medications for about two weeks. (R. 398). She denied any numbness, tingling, headaches or dizziness. *Id.*

At Dr. Willis' request, Harper was examined by a neurologist, Eric Edgar, M.D., on February 8, 2011, regarding a seizure that occurred on January 29, 2011. (R. 349-350). Harper's daughter reported Harper had been in the yard playing with her family when she suddenly grabbed her daughter's arm very tightly and began walking around in circles and speaking in gibberish, followed by falling to the ground and convulsing for several minutes. *Id.* Dr. Edgar performed a comprehensive general medical and neurological examination which was entirely normal, including mental status, cranial nerves, motor, tone, reflexes, sensation, coordination and

gait. *Id.* A CT scan of the head was "unrevealing." *Id.* Dr. Edgar reported that, though it was tempting to ascribe the "first ever seizure" to hyperglycemia, it was possible there was an underlying explanation and he recommended an MRI of the brain and a sleep-deprived EEG. (R. 350).

On March 16, 2011, during a lengthy discussion with Dr. Willis about the seizure, Harper reported that the MRI and EEG were normal but the neurologist told her not to drive so she could not work at her job thirty-five miles away. (R. 406). Harper asked Dr. Willis "why she stops in mid speech, and someone has to tell her she didn't finish her sentence." *Id.* Dr. Willis told Harper she needed to speak with her neurologist about that. *Id.* Harper told Dr. Willis on April 28, 2011, that she had not been checking her [blood] sugar at home but that she has a meter coming. (R. 407-409). Harper reported having some headaches and a little blurred vision. *Id.*

Harper's eyes were examined by Dennis M. Morris, O.D., on July 19, 2011. (R. 411-421). Dr. Morris found severe permanent damage to the right optic nerve due to cat scratch fever. (R. 416). On August 24, 2011, Alison Hanson, O.D., diagnosed Harper's left eye as normal but the right eye showed optic atrophy and that there was no likelihood that vision could be restored by operation or treatment. (R. 422-423).

Harper returned to Dr. Willis on August 25, 2011, for follow-up treatment for Diabetes and Hyperlipidemia. (R. 559-563). On December 14, 2011, Harper complained of numbness and tingling of her hands and said she was feeling depressed. (R. 554-558). She received dietary counseling and medication refills. *Id.* Harper was seen routinely for general health care and medication refills on December 28, 2011, January 11, 2012 and January 27, 2012. (R. 541-553).

Harper complained again of some numbness of the fingers of both hands and tingling of her hands and feet on March 28, 2012. (R. 536-540). Harper returned to Dr. Willis on May 29,

7

2012 and reported her depression was better but she had mood swings. (R. 532-535). Dr. Willis prescribed Abilify and noted that Harper had no complaints of numbness or tingling of limbs. *Id.*

In June 2012, Harper complained of swelling in both feet, for which she was treated with Mirapex. (R. 524-529). By July 31, 2012, the swelling in both feet and legs was much better but Harper complained of numbness and tingling in both her arms and legs. (R. 520-523). On August 27, 2012, Dr. Willis observed that the leg swelling was completely gone, but Harper was complaining of Restless Leg Syndrome. (R. 515-519). Dr. Willis noted that Harper had been non-compliant with her medication regimen and her blood sugar had increased. *Id.*

The medical record contains a report from Craig A. Kennedy, M.D., dated September 17, 2012, that Harper had presented to the emergency room with dizziness and near syncope that started while she was at the chiropractor. (R. 458-464). Harper stated that her blood sugars had been running in the 300s. *Id.* She was diagnosed with uncontrolled diabetes and was told to follow up with her primary care provider. (R. 464). On September 20, 2012, Harper told Dr. Willis she had gone to the emergency room because her blood sugar had spiked to 365. (R. 511-514). She complained that day that she had numbness and tingling in her fingers. *Id.* Dr. Willis started Harper on insulin injections and instructed her on how to use the medication. *Id.* Harper's check up one week later revealed Harper's sugar had been running high. (R. 506-510). Dr. Willis again noted that Harper had been noncompliant with her medication treatment regimen. *Id.*

On Oct. 22, 2012, Harper told Dr. Willis her medications were doing fine for her and she had no concerns. (R. 501-505). Harper saw Dr. Willis in November 2012 for a urinary tract infection. (R. 496-500). At that time, she had no musculoskeletal, neurological or psychological abnormalities or disturbances. *Id.* The final report in the record from Dr. Willis is dated January 9, 2013, and indicates that Harper was tolerating her medications well with sugar being "a little

abnormal since last seen" but she had no complaints of feeling week, tingling or numbness of the limbs and she had no muscoloskeletal symptoms or psychological disturbances. (R. 491-495).

In the record is a letter dated January 22, 2013, from Dr. Kasey Nichols, D.C., who stated he had seen Harper on September 12, 2012. (R. 568). Harper told Dr. Nichols that she had a prior history of hip problems, "due to several falls from frequent seizures, with the latest seizure being 1½ years before." Harper also mentioned that she has intermittent episodes of numbness and tingling in bilateral hands and feet. *Id.* After examination, the chiropractor diagnosed lumbar and pelvic segmental dysfunction associated with a lumbar sprain/strain, and complicated by lumbar disc degeneration. *Id.*

Consultative Examinations:

Brian R. Snider, Ph.D., a psychologist, examined Harper and conducted a Mental Status Exam on behalf of the agency on October 31, 2011. (R. 425-429). Dr. Snider reported that Harper's chief psychiatric complaint was depression. (R. 425). He recorded Harper's history of one inpatient psychiatric admission to Laureate for a "nervous breakdown" and suicidal thoughts. *Id.* Harper told Dr. Snider that her current treatment consisted of Zoloft medication prescribed by her primary care physician. *Id.* She complained of depression most of the time for the past one and a half years, as well as decreased interest in pleasurable activities, appetite increase, weight gain, insomnia, fatigue and occasional suicidal thoughts. *Id.* Harper told Dr. Snider that, in a normal day, she gets up, gets her son ready for school, watches television and does puzzles, that she has no difficulty completing chores indoors but that yard work is difficult due to poor eyesight. (R. 426). Claims that she must be accompanied while grocery shopping and not driving were linked to her poor eyesight. *Id.* She admitted that she occasionally neglects her self-care due to depression. *Id.* After conducting a mental status examination, Dr. Snider said:

> Ms. Harper would probably have little difficulty understanding and carrying out simple instructions and would likely have mild difficulty with complex and detailed instructions. She is likely to have mild difficulty concentrating and persisting through a normal work day due to psychiatric symptoms. Her ability to maintain a normal workday and work week without interruptions from her psychiatric symptoms is likely mildly impaired. In all likelihood, she would have mild difficulty responding appropriately to coworkers, supervisors, and the public. Ms. Harper appears capable of managing her own funds responsibly.

(R. 427). His diagnostic impression was Major Depressive Disorder, Single Episode, Mild, with an assessed GAF score of 69. *Id.* He recommended that Harper continue receiving outpatient psychiatric care from her primary care physician. He said: "With appropriate and consistent psychiatric care, Ms. Harper should expect to experience improvement in her psychiatric symptoms." (R. 428).

On November 23, 2011, Tom Shadid, Ph.D., a non-examining agency consultant, found Harper has a severe mental impairment under Listing 12.03, Affective Disorders, of Major Depressive Disorder, recurrent, severe, w/o psychotic features. (R. 434). He filled out PRT and RFC forms. (R. 431-448). Dr. Shadid rated Harper's functional limitations under the "B" criteria as mild and moderate and determined that no episodes of decompensation had occurred. (R. 441). In assessing Harper's mental RFC, Dr. Shadid assigned moderate limitations in Harper's ability to understand, remember and carry out detailed instructions and in Harper's ability to interact appropriately with the general public.  (R. 445-446). Dr. Shadid concluded that Harper can perform simple and some complex tasks, relate to others on a superficial work basis and adapt to a work situation. (R. 447).

The record contains a physical RFC assessment by Kenneth Wainner, M.D., a non-examining agency consultant, on November 28, 2011. (R. 449-456). Dr. Wainner determined

10

Harper can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, can stand and/or walk about six hours in an 8-hour workday, can sit, with normal breaks, about six hours in an 8-hour workday and has no limitations in ability to push and/or pull, including operation of hand and/or foot controls. *Id.* Dr. Wainner found that Harper's loss of right eye vision resulted in decreased depth perception and loss in field of vision. (R. 452). Dr. Wainner determined Harper should avoid even moderate exposure to environmental hazards, including machinery and heights, due to her single episode of seizure-like activity and loss of depth perception and field of vision. (R. 453). In support of these conclusions, Dr. Wainner cited records from Dr. Willis and Dr. Edgar and the daily activities reported by Harper's husband. (R. 456). His conclusion was:

> Moderate to severe limitations secondary to uncontrolled diabetes, right eye blindness and a seizure like event of unknown etiology with visual and environmental restrictions. Pain is not considered as additional limitation. Clmt with partial credibility as reported symptoms appear greater than the objective medical evidence. This light RFC is appropriate and supported by the medical evidence in file.

*Id.*

After the hearing, the ALJ ordered an Motor Nerve Study which was conducted on February 25, 2013, and a consultative medical examination which was performed by Michael Karathanos, M.D., on March 4, 2013. (R. 633-640).

The Motor Nerve, Sensory Nerve and EMG studies were conducted by Ashok Kache, M.D., M.B.A., on February 25, 2013, three weeks after the administrative hearing. (R. 626-631). Dr. Kache found: 1) mild bilateral carpal tunnel syndrome; 2) normal bilateral ulnar motor and sensory nerve conduction studies; 3) normal nerve conduction studies of bilateral lower extremities without evidence of neuropathy; and 3) needle emg findings consistent with above

diagnoses. (R. 631). It is not clear whether the results of these studies were available to Dr. Karathanos, who examined Harper a week later.

In the narrative portion of his report, Dr. Karathanos recorded Harper's complaints that her diabetes mellitus has never been under good control despite multiple medication and insulin adjustments, that she has only light perception and movement sensation in the right eye, that she has been suffering from restless leg syndrome at night and that she has weakness and a "rubbery sensation" if she walks for any prolonged period of time along with mild burning type or tingling sensation in her feet. *Id.* Dr. Karathanos' motor examination did not disclose any definite focal deficit in the upper or lower extremities. *Id.* Harper's grip strength was equal with no rigidity or spasticity and no atrophy or fasciculations or any involuntary movements or tremors detected. *Id.* Harper's gait was stable and normal and her coordination was preserved. *Id.* The sensory examination demonstrated slightly decreased sensation to pinprick in a stocking type distribution up to the middle calf area. *Id.* Harper's reflexes were symmetrical without any pathological reflexes. *Id.* Dr. Karathanos' medical assessment was: 1) Legally blind on the right due to cat scratch disease infection in the past; 2) Mild evidence of neuropathy, probably diabetic; 3) History of uncontrolled restless leg syndrome at night; and 4) Diabetes mellitus under poor control. (R. 634).

Attached to Dr. Karathanos' narrative report is a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (R. 635-640). On that form, Harper's ability to lift and carry is indicated to be limited to up to ten pounds occasionally. (R. 635). Harper's ability to sit at one time without interruption is limited to 2 hours. (R. 636). Her ability to stand and walk is limited to 30 minutes each. *Id.* Harper is limited to sitting a total of six hours in an 8-hour workday and standing and walking a total of one hour each. *Id.* Regarding use of the hands and

feet for reaching and handling, the form was left blank. (R. 637). Regarding ability to perform fingering, feeling, push/pull and operation of foot controls, the column on the form for "occasionally" contains question marks. *Id.* The portion of the form for denoting abilities to climb stairs and ramps has what appears to be a check-mark in the column for "never" that was scribbled over. (R. 638). A check mark appears clearly in the column for "never" in ability to climb ladders or scafffolds. *Id.* A line is drawn through the "never" column for stooping, kneeling, crouching and crawling. *Id.*

On the question: "Do any of the impairments affect the claimant's hearing or vision" Dr. Karathanos circled the word "vision" and wrote: "Blind (R) eye." *Id.* The questions regarding the ability to avoid ordinary hazards, read very small print and ordinary newspaper or book print, view a computer screen and determine differences in shape and color of small objects were left blank. *Id.* On the section of the form dealing with environmental limitations, Dr. Karathanos checked the column "never" for unprotected heights, moving mechanical parts, operating a motor vehicle, humidity and wetness and extreme cold. (R. 639). The remaining conditions: dust, odors, fumes, pulmonary irritants, extreme heat, vibrations and noise, were left blank. *Id.* Dr. Karathanos indicated Harper could perform activities like shopping, travel without a companion for assistance, ambulate without a wheelchair, walker or canes, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care for personal hygiene and sort, handle and use paper/files. (R. 640). Dr. Karathanos signed the form. *Id.*

### Decision of the Administrative Law Judge

In his decision, the ALJ found that Harper met the agency's insured status requirements through December 31, 2014. (R. 21). At Step One, the ALJ found that Harper had not engaged

in any substantial gainful activity since her alleged onset date of June 1, 2009. *Id.* At Step Two, the ALJ found that Harper has severe impairments of blindness in the right eye, diabetes, degenerative disc disease and depression. *Id.* At Step Three, the ALJ found that Harper's impairments did not meet any Listing. (R. 25).

The ALJ found that Harper has the RFC to perform "light" work except that she is limited in depth perception and in her field of vision and should avoid exposure to hazards such as dangerous machinery and unprotected heights. (R. 24). The ALJ also concluded that Harper can perform simple and some complex tasks, relate to others on a superficial work basis and adapt to a work situation. *Id.*

As explanation for this RFC assessment, the ALJ found Harper's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible. (R. 25). The ALJ summarized Harper's testimony and that of her husband. (R. 25). He summarized the medical evidence in the record, noting Harper's intermittent complaints of numbness and tingling in her hands and feet in 2012, as well as the results of MRI, EMG and nerve conduction studies that "shows very little objective evidence of more than minimal neuropathy." (R. 26).[2] The ALJ pointed to evidence in the medical record that Harper's dizziness and other symptoms associated with diabetes occurred as a result of her failure to take her medication as prescribed. (R. 27). Regarding Harper's complaints of disabling depression, the ALJ referenced the medical evidence that Harper was doing well and that her medication for depression was working "just fine." *Id.* The ALJ found that the medical evidence was inconsistent with Harper's claim at the hearing that

---

[2] The medical evidence the ALJ cited as contradictory of Harper's testimony consist of the EMG and nerve conduction studies performed on February 25, 2013 (Dr. Kache's report) and Dr. Karathanos' finding of "only slightly decreased sensation in Harper's legs" on March 4, 2013. (R. 26, 626-640).

the medication she takes for depression does not work. *Id.* The ALJ noted that the medical record contained statements from Harper to medical care providers that she normally has no falls and that she never complained of falling "quite often" to her primary care doctor which conflicted with Harper's testimony. *Id.* The ALJ found the inconsistencies between the medical treatment record and Harper's testimony reduced Harper's credibility. *Id.*

The ALJ also noted that Dr. Willis' treatment records reflected that Harper continued to work as a janitor throughout 2011 and 2012. (R. 27-28).[3]

Regarding the agency consultative examiners, the ALJ noted that Dr. Karathanos's narrative report indicated Harper had mild evidence of diabetic neuropathy. (R. 29). The ALJ acknowledged that Dr. Karathanos had submitted a statement regarding Harper's ability to do work-related activities. (R. 29). He concluded, however, that the opinions indicated on the form were entitled to "little weight" because the form "is incomplete." *Id.* The ALJ gave "great weight" to Dr. Snider's psychological evaluation because Dr. Snider was both an examining psychologist and deemed an expert who is highly knowledgeable in the area of disability and because his opinion is well supported and largely consistent with the record. (R. 29). The ALJ cited Dr. Wainner's physical RFC assessment and Dr. Shadid's PRT and mental RFC assessment by exhibit numbers. (R. 29). He accorded those opinions "significant weight" because they reflected findings by "deemed experts," highly knowledgeable in the area of disability and "because their opinions are well supported by medically acceptable clinical and laboratory techniques and largely consistent with the record as a whole as detailed above." (R. 29).

---

[3]It is not clear how this finding impacted the ALJ's decision as he found at Step Two that Harper had not engaged in substantial gainful activity since June 1, 2009, the date she claims she became disabled. (R. 21).

15

At Step Four, the ALJ determined that Harper could not return to her past relevant work as a janitor, warehouse packager and newspaper deliverer. (R. 30). At Step Five, the ALJ found that there are a significant number of jobs in the national economy that Harper could perform, taking into account her age, education, work experience, and RFC. (R. 30-31). Therefore, the ALJ found that Harper was not disabled at any time from June 1, 2009, through April 23, 2013, the date of his decision. (R. 31).

## Review

Harper asserts that the ALJ erred in rejecting the opinion evidence of Dr. Karathanos and in failing to link his credibility determination to specific evidence.[Dkt. 12 at 5]. She contends that the "generalities" the ALJ cited are inconsistent with the specifics in the record. [Dkt. 12 at 5.]. The undersigned agrees that reversal is required due to errors of the ALJ in his discussion and analysis of the opinion evidence of Dr. Karathanos. Therefore, the Commissioner's decision is hereby **REVERSED AND REMANDED**.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The ALJ is required to discuss all opinion evidence and to explain the weight he gives it. *Id.* An ALJ must discuss more than just the evidence favorable to an opinion that a claimant is not disabled:

> [I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects.

*Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). It is error to ignore evidence that would support a finding of disability while highlighting the evidence that favors a finding of nondisability. *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007).

16

In this case, because Harper's treating physicians did not express any opinions regarding Harper's abilities to perform work activities, the only medical evidence available to the ALJ in that regard was the opinions of agency physicians.

Dr. Karathanos conducted an in-person physical examination of Harper at the request of the ALJ. (R. 91; 633). Dr. Karathanos' opinion is therefore considered an "examining medical-source opinion." *Chapo v. Astrue*, 682 F.3d. 1285, 1291 (10th Cir. 2012) see also 20 C.F.R. §§ 404.1527(c)(1); 416.927(c)(1). Such opinions are "given particular consideration" in that they are "presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record." *Chapo v. Astrue*, 682 F.3d at 1291. An examining medical-source opinion "may be dismissed or discounted, of course, but such an act must be based on an evaluation of all of the factors set out in the ... regulations and the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (internal quotation marks omitted). The relevant factors include: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; 3) the degree to which the physician's opinion is supported by relevant evidence; 4) consistency between the opinion and the record as a whole; 5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and 6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F. 3d 1297, 1301 (10th Cir. 2003); *Chapo*, 682 F.3d at 1291 (noting analysis under these factors applies to examining medical-source opinions); see also 20 C.F.R. ss 404.1527(c); 416.927(c). The ALJ is not required to mechanically apply all of these factors in a given case. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). It is sufficient if he "provide[s] good reasons in his decision for the weight he gave to the [physician's] opinions. *Id.* But the duty to supply such reasons is the

17

ALJ's, neither the Commissioner nor the courts may supply post-hoc reasons that the ALJ did not provide. *See Kauser v. Astrue, 638 F.3d 1324, 1330 (*10th Cir. 2011*).*

Here, the only justification the ALJ offered for giving Dr. Karathanos' opinions "little weight" is that the doctor had not completely responded to all the questions on the Ability to Perform Work-Related Activities form. (R. 29). The undersigned does not agree with Harper that, by leaving blank the answers to some questions and writing question marks on other parts of the form, Dr. Karathanos indicated he did not feel competent to express an opinion or that those opinions would have been favorable to Harper [Dkt. 12, at 5; 18, at 2]; however, the Commissioner's argument that the ALJ gave valid reasons for giving less weight to Dr. Karathanos' findings is not accurate. [Dkt. 17, at 4]. The Commissioner claims that the ALJ noted inconsistencies between Dr. Karathanos' examination narrative report and the physical "Ability to do Work-Related Activities" form. *Id.* Review of the ALJ's decision reveals otherwise. The ALJ did not discuss "the mostly normal results" of the doctor's neurological examination.  Nor did he articulate that the doctor's opinions regarding plaintiff's abilities to perform work-related activities were "inconsistent with [his own] observations and clinical findings." [Dkt. 17, at 5]. The only reason the ALJ offered for giving greater weight to the opinion evidence from the agency non-examining consultant than Dr. Karathanos' findings was that "Dr. Karathanos did not completely respond to all questions and the undersigned cannot assume that his responses are to be considered favorable to Ms. Harper." (R. 29).  Nowhere in the ALJ's decision did he expressly find that Dr. Karathanos' opinion evidence was internally inconsistent. Nor did he cite such an inconsistency as grounds for discounting or rejecting Dr. Karathanos' findings regarding Harper's abilities to do work-related activities in favor of the opinion of a non-examining agency consultant who reviewed Harper's treatment records over a  year before the hearing.

18

The Commissioner further contends that the record was more than adequate to assess Harper's RFC without considering Dr. Karathanos' opinions. [Dkt. 17, at 6]. While it may be correct that, but for Dr. Karathanos' findings regarding Harper's abilities to perform work-related activities, the record contains substantial evidence to support the ALJ's credibility determination, in the absence of a more thorough analysis and more specific findings, the court declines the Commissioner's invitation to create or adopt post-hoc rationalizations to support the ALJ's decision. *See Haga v. Astrue*, 482 F. 3d 1205, 1207 (10th Cir. 2007); *Allen v. Barnhart*, 357 F.3d 1140, 1142, 1145 (10th Cir. 2004) (holding that district court's "post hoc" effort to salvage the ALJ's decision would require court to overstep its institutional role and usurp essential functions committed in the first instance to the administrative process). As Harper points out, after the hearing, the ALJ sent her for EMGs and an examination by a neurologist to help him assess the extent of Harper's neuropathy related limitations. (R. 91). It was therefore improper for the ALJ to ignore the portions of that neurologists's opinion that were favorable to Harper without explaining his rationale for not adopting those findings. *See Robinson v. Barnhart*, 365 F.3d at 1083. The ALJ's rejection of Dr. Karathanos' findings that were favorable to Harper based upon the doctor's failure to completely fill out the form, while using other portions of the doctor's report to refute Harper's claims of disabling impairments was improper. *See Robinson v. Barnhart*, 366 F.3d at 1083, (ALJ may not ignore evidence that does not support his decision, especially when that evidence is significantly probative). In the absence of ALJ findings, supported by specific weighing of Dr. Karathanos' opinions, the court cannot assess whether relevant evidence adequately supports the ALJ's RFC determination and whether he applied the correct legal standards in reaching his conclusion that Harper can perform light work with the additional limitations he assessed.

**Conclusion**

Because the court concludes that the ALJ committed reversible error by failing to adequately explain in his decision how he weighed the evidence from the examining medical consultant, the court **REVERSES and REMANDS** the ALJ's decision for further consideration.

The Court takes no position on the merits of Harper's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Based on the foregoing, the April 23, 2013, decision of the Commissioner denying disability benefits to Claimant is **REVERSED AND REMANDED for reconsideration.**

Dated this 6th day of May, 2016.

_____
Paul J. Cleary
United States Magistrate Judge